**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**ARIELLE SWARR,**

      **Plaintiff,**

v.                                                     Civil Action No: <u>3:24cv314</u>

**EQUIFAX INFORMATION SERVICES, LLC,**
*Serve*:  Corporation Service Company, Reg. Agent
      100 Shockoe Slip
      2nd Floor
      Richmond, VA  23219

**EXPERIAN INFORMATION SOLUTIONS, INC,**
*Serve*:  CT Corporation System, Reg. Agent
      4701 Cox Road, Suite 285
      Glen Allen, VA 23060

**and**

**TRANS UNION, LLC**
*Serve*:  Corporation Service Company, Reg. Agent
      100 Shockoe Slip
      2nd Floor
      Richmond, VA 23219

      Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **ARIELLE SWARR** (hereafter "Ms. Swarr" or "Plaintiff"), by and through the undersigned Counsel, and alleges the following against Defendants, **EQUIFAX INFORMATION SERVICES, LLC** (hereafter "Equifax"), **EXPERIAN INFORMATION SOLUTIONS, INC.** (hereafter "Experian"), and **TRANS UNION, LLC** (hereafter "Trans Union"). Plaintiff alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought to enforce and protect the civil rights of the Plaintiff afforded and enacted by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.      Today in America there are three major consumer reporting agencies ("CRAs"), Defendants Trans Union, LLC, Equifax Information Services, LLC and Experian Information Solutions, Inc.

3.      The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.      This requirement of reasonable procedures designed to ensure the maximum possible accuracy of information that CRAs report is meaningful, and no mere formality. It is not enough for CRAs to simply parrot information they receive from a lender, particularly when a consumer makes a dispute about information reported.

5.      When a consumer disputes information through the CRAs, those disputes are transmitted to the party furnishing the information, in this matter, the Higher Education Loan Authority of the State of Missouri ("MOHELA"), which received full payment for student loans after Plaintiff refinanced those loans but failed to update its credit reporting to reflect the payoff. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.      Plaintiff brings claims under Section 1681e(b) against CRAs Equifax, Experian, and Trans Union because inaccurately reported that Plaintiff owed money on student loans she had

paid off through a refinance with another lender. When Plaintiff disputed these inaccuracies, Equifax, Experian, and Trans Union also violated 1681i by failing to conduct reasonable investigations of the information they were reporting in Plaintiff's credit files regarding the student loans.

7.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly true as to how these Defendants have complied—or failed to comply—with their now 50-year-old obligation to conduct meaningful accuracy investigations.

8.      Equifax, Experian, and Trans Union have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts due to their automated parroting of whatever their customer-creditors instruct. Had Equifax, Experian, and Trans Union followed the CFPB's advice and heeded the many warnings of courts and regulators alike, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

9.      The jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 § U.S.C. 1331.

10.     Venue is proper because a substantial part of the events giving rise to the claim occurred in this District and Division, and Equifax, Experian, and Trans Union regularly transact business within this District.

## PARTIES

11.     The Plaintiff is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Equifax is a limited liability company, authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, Virginia.

13.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f), (hereinafter, a "CRA"). Upon information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

14.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

15.     Experian is a corporation, authorized to do business in the Commonwealth of Virginia through its registered agent located in Richmond, Virginia.

16.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) (hereinafter, a "CRA"). Upon information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

17.      Experian disburses consumer reports to third parties under contract for monetary compensation.

18.     Trans Union is a limited liability company, authorized to do business in the Commonwealth of Virginia through its registered agent located in Richmond, Virginia.

19.     Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f) (hereinafter, a "CRA"). Upon information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

20.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the Defendants' Creditor-Customers*

21.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); "In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

22.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke,* 2011 WL 1085874, at *4.

23.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer

oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

24.     Section 1681i(a) on the other hand requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through the consumer's dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C.A. § 1681i(a)(1)(A).

25.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

26.     It has long been the law that a CRA, such as Equifax, Experian, and Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-CV-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No.

1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could

find that merely contacting [the creditor] was not sufficient to determine whether the disputed

information was inaccurate.")

27.     That "grave responsibility" imposed by the FCRA reinvestigation requirement

"must consist of something more than merely parroting information received from other

sources." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir.1997).     Accordingly,     "a

'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot

fulfill the obligations contemplated by the statute." *Id.* The *Cushman* court held that Trans Union's

reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort

it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely

duplicative of each other." *Id.*

28.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or
systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see
Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a
searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

29.     Further, as the Defendants are aware, the Eastern District of Virginia has held that

even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a

duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and

that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§ 1681e(b) and § 1681i(a)].
For example, Section 1681e(b) requires (1) "reasonable procedures" that (2)
"assure" (3) "maximum possible accuracy." To "assure" means "to make sure or
certain: put beyond all doubt." *Webster's Third New International Dictionary* 133
(1993). "Maximum" means the "greatest in quantity or highest degree attainable"
and "possible" means something "falling within the bounds of what may be done,
occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how

"maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

30.     Today, furnishers also have their own independent duties under the FCRA—principally those found at 15 U.S.C. §1681s-2—which Congress first imposed almost 30 years ago. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### The Payoff of the MOHELA Loans

31.     MOHELA serviced two student loans taken out by Plaintiff, who always made her payments on time. Plaintiff also had a third student loan serviced by University Accounting Service, LLC ("UAS"). In or around March 2022, Plaintiff used LendKey Technologies, Inc. ("LendKey")[1] to refinance these student loans with Park View Federal Credit Union. As part of this process, Plaintiff obtained a payoff statement for the loans serviced by MOHELA and provided it to LendKey.

32.     On or about March 11, 2022, LendKey sent a payoff check to MOHELA for $35,705.60. MOHELA deposited this check on or about March 14, 2022, as it posted to LendKey's bank account on March 14, 2022. Despite receiving this payoff check, MOHELA claimed (and continues to claim) that the loans it serviced remained outstanding.

33.     LendKey also sent a payoff check to UAS, which acknowledged it had received full payment of Plaintiff's third student loan in correspondence sent to Plaintiff in May 2022.

---

[1] LendKey "matches consumers with community banks and credit unions to create the most transparent, accessible and low-cost borrowing options in online lending." *LendKey—About Us*, available at https://www.lendkey.com/about/ (last accessed on Apr. 23, 2024).

34.     Plaintiff eventually learned that MOHELA failed to record the payoff of her student loans and repeatedly disputed this failure directly to MOHELA.

35.     Plaintiff then obtained copies of her Equifax, Experian, and TransUnion credit reports and discovered that MOHELA continued to report the false outstanding balances in her credit files.

### *Plaintiff Disputes the Inaccuracies with The CRAs*

36.     On or about November 14, 2023, Plaintiff submitted written disputes via Certified Mail to the CRAs regarding MOHELA's false reporting. In her dispute letters, Plaintiff stated that she had refinanced the loans serviced by MOHELA and LendKey paid the loans off in full in March 2022

37.     On or about November 29, 2023, Equifax forwarded its investigation results to Plaintiff and verified the balance reporting by MOHELA for both loans.

38.      On or about November 29, 2023, Experian forwarded its investigation results to Plaintiff and verified the balance reporting by MOHELA for both loans.

39.     On or about November 30, 2023, Trans Union forwarded its investigation results to Plaintiff and verified the balance reporting by MOHELA for both loans.

40.     In 2023, Equifax, Experian, and Trans Union continued to report the MOHELA with a balance.

41.     To lower their costs, Defendants intentionally choose not to comply with the FCRA. Accordingly, Defendants' violations of the FCRA were willful.

### *The CRAs Did Not and Do Not*
### *Conduct Any Investigation of Most Consumer Disputes*

42.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of Equifax, Experian, and Trans Union to refuse to perform the statutorily mandated FCRA investigation and

instead delegate all action in response to consumer disputes to a third-party outsource vendors located overseas. Equifax and Trans Union use a vendor, previously known as Intelenet Global Services and now as Teleperformance.

43.    Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

44.    For Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes, scans them into a batch of other disputes. Equifax then forwards the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India.

45.    Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania before forwarding the batches to Teleperformance.

46.    Both Teleperformance and the Experian affiliate use low-wage employees to work quickly to process consumer dispute letters received, skimming the letters and selecting one or a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as Plaintiff alleges against Equifax for its farming-out investigations to Teleperformance.

47.     Teleperformance agents and Experian Chile are not allowed to do any of the following things: contact the consumer, use the telephone or e-mail to investigate, research, contact the furnisher directly, or take longer than 5 minutes per dispute.

48.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

49.     In fact, all three credit reporting agencies strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect?). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union and Experian. It gets sent to Defendants' creditor customer (such as MOHELA) for their sole review and consideration.

50.     The CRAs believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

51.     Both Equifax and Trans Union have taken the position in other litigation that it has no control over Teleperformance. For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18,

2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

57.     Trans Union has taken and succeeded with this same position. *See, e.g., Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

58.     Equifax, Trans Union and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### *Plaintiff Suffered (and Continues to Suffer) Actual Harm*

59.     Equifax, Experian, and Trans Union continue to report the MOHELA accounts as outstanding on Plaintiff's reports, despite being notified that this information is false. After receiving and processing Plaintiff's disputes, Equifax, Experian, and TransUnion accepted and published MOHELA's reporting that the student loans were delinquent even though they were paid off in March 2022.

60.     Plaintiff has been attempting to resolve these matters with Defendants and her credit was significantly destroyed by Defendants' failures to correct the inaccurate reporting.

61.     As a result of the defamatory nature of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

      a.    Stress associated with not being unable to correct the errors to have the false MOHELA reporting removed from her credit files;

      b.    Monies lost by attempting to fix her credit, e.g., communication costs, postage for disputes;

      c.    Loss of time attempting to cure the error;

  d. Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

  e. Stress associated with attempting to resolve this matter.

  f. Fear of embarrassment and reluctance to apply for credit.

  g. Loss of privacy and harm to her reputation.

62. While her true credit history is stellar, Plaintiff cannot qualify for a mortgage loan because of the demonstrably false, derogatory reporting in her credit files.

***Defendants' Conduct Was Willful***

64. The FCRA allows for a remedy for a "willful" violation. A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

65. Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va*., 526 F.3d 142, 151 (4th Cir. 2008).

66. As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Equifax, Experian, and Trans Union's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

67. Equifax, Experian, and Trans Union have received thousands of disputes and other complaints regarding the creditors at issue in this case—an amount sufficient to require a

reasonable company to at least examine or investigate further before blindly accepting further reporting.

68.     Just in federal court alone, during the past decade the creditor-furnisher disputed by Plaintiff has had to defend numerous consumer credit lawsuits.

69.     In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

70.     Equifax, Experian, and Trans union knew or should have known of this litigation history. They use and have access to PACER to investigate and monitor consumer complaints.

71.     The CFPB has maintained a Consumer Complaint database since 2017. It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

72.     Each Defendant regularly receives unredacted consumer dispute details from this database.

73.     Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

74.     Since the database began accepting complaints in 2017, the CRPB has sent hundreds of thousands of consumer reporting complaints to Experian.

75.     Since the database began accepting complaints in 2017, the CRPB has sent hundreds of thousands of consumer reporting complaints to Trans Union.

76.     Further, over 190,000 of the CFPB complaints as to Equifax were based largely on their failure to reasonably investigate consumer disputes.

77.     Over 150,000 complaints as to Experian were based largely on their failure to reasonably investigate consumer disputes.

78.     Over 160,000 complaints of the CFPB complaints as to Trans Union were largely based on their failure to reasonably investigate consumer disputes.

79.     Just in the last 12 months alone, Equifax, Experian, and Trans Union have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the CRA Defendants violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

80.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put the CRA Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor- customer tells them if the consumer has provided a substantive and detailed dispute.

81.     Equifax, Trans Union and Experian have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g., Centuori v. Experian Info. Sols.*, Inc., 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of

plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

82.     Equifax has even been warned by one of its home state District Courts, the Southern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

83.     Defendants have long had specific notice of these requirements. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair

Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

84.     Defendants have also repeatedly been criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

85.     In 2015, a large group of state Attorneys General forced a consent order from the Equifax and Experian by which they were required to develop procedures necessary to comply with the FCRA. Among the many changes imposed, the AG Settlement mandates that the Equifax and Experian comply with § 1681i(a).[3]

86.     The AG Settlement also requires Equifax and Experian to conduct significant research and data gathering—even creating a "working group" to address these issues—and to develop special procedures to handle disputes in cases like this. Notwithstanding these requirements, Equifax and Experian did not meaningfully comply with the AG Settlement in these regards.

87.     Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Media/News-Releases/May-2015/Attorney-General-DeWine-Announces-Major-National-s.

Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors, National Consumer Law Center, February 2019. ("NCLC Report").[4]

88.     The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

89.     Among many of the Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.
- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.
- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.
- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

---

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

NCLC Report at 6.

90.     Despite the notice and judicial, regulatory and public interest criticism, Equifax, Experian, and Trans Union have refused to change their dispute investigation processes because it would cost them money to do so.

91.     Equifax, Experian, and Trans Union's procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided entirely with just modest imposition.

### CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### (Equifax, Experian, and Trans Union)

92.     Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

93.     Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files they published and maintained concerning the Plaintiff.

94.     As a result of this conduct, action, and inaction of Equifax, Experian, and Trans Union, Plaintiff suffered actual damages, including but not limited to: loss of access to credit, damage to reputation, embarrassment, humiliation, feelings of fear, loss of sleep, and loss of concentration.

95.     The violations by Equifax, Experian, and Trans Union were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the

Court pursuant to 15 U.S.C. § 1681n. In the alternative, if Defendants are negligent, Plaintiff is entitled to recover under 15 U.S.C. § 1681o.

96.     Plaintiff is entitled to recover costs and attorneys' fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II:**
**VIOLATION OF THE FAIR CREDIT REPORTING ACT 15**
**U.S.C. § 1681i(a)**
**(Equifax, Experian, and Trans Union)**

97.     Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

98.     Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from the Plaintiff's credit files.

99.     Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(4) by failing to consider all relevant information submitted by Plaintiff.

100.     Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

103.     As a result of Equifax, Experian, and Trans Union's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: loss of access to credit, damage to reputation, embarrassment, humiliation, feelings of fear, loss of sleep, and loss of concentration.

104.     The violations by Equifax, Experian, and Trans Union were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

105.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment and actual, statutory, and punitive damages against Defendants, jointly and severally; for her attorneys' fees and costs; for pre-judgment and post-judgment interest at the legal rate, specific performance and injunctive relief, and such other relief the Court does deem just and proper.

Respectfully submitted,

**ARIELLE SWARR**

By: */s/ Drew D. Sarrett*
Drew D. Sarrett, VSB #81658
CONSUMER LITIGATION ASSOCIATES, P.C.
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
(804) 905-9900—Telephone
(757) 930-3662—Facsimile
Email: drew@clalegal.com

*Counsel for Plaintiff*